NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with FED. R. APP. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted November 9, 2022[*]
Decided November 10, 2022

**Before**

FRANK H. EASTERBROOK, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

THOMAS L. KIRSCH II, *Circuit Judge*

No. 22-1441

| | |
|---|---|
| REBECCA I. HARP,<br>    *Plaintiff-Appellant,*<br><br>v.<br><br>KILOLO KIJAKAZI,<br>Acting Commissioner of Social Security,<br>    *Defendant-Appellee.* | Appeal from the United States District Court for the Eastern District of Wisconsin.<br><br>No. 20-C-1743<br><br>Lynn Adelman,<br>*Judge.* |

## O R D E R

The Social Security Administration reopened Rebecca Harp's application for disability insurance benefits based on evidence that she had concealed income, and relying on that evidence, it revoked her benefits. Harp argues that the agency wrongly reopened her case and that the money she concealed was not from substantial gainful

---

[*] We have agreed to decide the case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

activity and thus did not affect her eligibility for benefits. Because substantial evidence supports the agency's contrary findings, we affirm.

Harp's adult daughter, Nashawn, is disabled and requires extensive care. State programs in Wisconsin will pay caregivers, including family members, for at-home care. In 2014, Harp selected herself and her other daughter as Nashawn's caregivers and received money through a state program. After a payment issue arose with that program, Harp enrolled Nashawn in a different program and again selected herself as a caregiver. That program paid family members for services that "exceed the typical care-giving/support responsibility" of family members, such as toileting, bathing, assisting with complete transfers, and other "unique services." Case managers regularly assessed whether payments to Harp were proper under this standard. Harp earned, on average, thousands of dollars per month from both programs in 2014 and 2015.

While Harp was receiving this money from the state programs, she applied for federal disability insurance benefits based on a spine injury. Her income and work history are relevant to her eligibility for benefits. *See* 20 C.F.R. §§ 404.1572, 404.1574(a). At her hearing before an administrative law judge, Harp did not disclose receiving any money from these state programs; nor did she list her caregiving work in her "Claimant's Work Background," a form that she signed with her application. Unaware of these omissions, the ALJ ruled in 2015 that she was disabled and eligible for benefits. She began receiving benefits shortly afterward.

A few years later, the Social Security Administration learned of Harp's income from the state programs and halted her benefits. Harp received a letter from the agency in April 2019 warning that she would no longer receive disability benefits. The agency explained that it was reopening the disability ruling based on evidence (pay stubs from the state programs listing Harp as an "employee" and itemizing her "gross wages") that Harp had wrongly concealed earnings. Her benefits temporarily resumed, though, after she requested reconsideration. A month before the hearing on the reopened case, the agency wrote that she would receive disability payments that she was "due."

The hearing came next. Harp swore that she never performed caregiving tasks for Nashawn and could not perform certain tasks (like picking Nashawn up) because of her spinal injury. When asked why the state paid her thousands of dollars monthly, she admitted that it paid her for the overnight hours "monitoring" Nashawn and changing her diapers when no other caregiver was present. She conceded that, if she did not do this monitoring, the state would have paid another caregiver for it. But, Harp insisted, she did not need to disclose the payments because they were not "wages" for work but

a "stipend" for "a home"; the state programs did not report it to the Social Security Administration; and an IRS agent told her that she did not need to pay taxes on it. Finally, Nashawn's daytime caregiver testified that she did not observe Harp caring for her daughter while that caregiver was present.

The ALJ ruled against Harp, concluding that she had engaged in substantial gainful activity and earned, on average, thousands of dollars monthly for caregiving services. 20 C.F.R. §§ 404.1572, 404.1574(a). This activity and the income it generated meant that she was not disabled and was ineligible for disability insurance benefits. 20 C.F.R. § 404.1520(b). *See* SSA, Substantial Gainful Activity, *available at* https://www.ssa.gov/oact/cola/sga.html (listing the disqualifying amounts as earnings between $1,070 and $1,130 per month from 2014 to 2016) (last accessed October 7, 2022). The Appeals Council denied Harp's request for review, and the district court upheld the ALJ's order. We review the district court's ruling de novo, *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022), and uphold the ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019).

On appeal, Harp takes aim at the decision to reopen her case. In her view, the letter that she received a month before the hearing, promising that she would receive resumed benefits that she was due, was the "final" decision of the agency. But the letter does not purport to be final, and it did not cancel the upcoming hearing on her reopened case to decide what benefits she was due. Moreover, the standard for "reopening" was met here. Determinations about benefits may be "reopened" "[a]t any time if—(1) It was obtained by fraud or similar fault." 20 C.F.R. § 404.988(c)(1). The letter notifying Harp of the agency's decision to reopen her case was supported by ample evidence of "fraud or similar fault." The evidence included the pay stubs from state programs listing Harp as an "employee" and the "wages" they paid her at the very time she claimed that she was not working. In her reply brief, Harp argues for the first time that these pay statements are "fabricated." But this argument is unsubstantiated, and she waived it because she did not raise it before the district court or in her opening brief. *See Wonsey v. City of Chicago*, 940 F.3d 394, 398 (7th Cir. 2019).

Harp next reprises her contention that the ALJ wrongly decided to cancel her benefits because, in her view, the income she received from the state care programs was not for substantial gainful activity. She revisits the reasons she gave to the ALJ, but they are all unavailing. First, she contends that the income did not disqualify her from benefits because it was not taxable. But the regulations describe substantial gainful

activity as "work that is usually done for pay or profit" and make no distinction between taxable income and non-taxable income. 20 C.F.R. § 404.1572(b).

Second, she argues that her assertion that her spinal injury prevented her from caring for her daughter, and the daytime caregiver's testimony, support Harp's view that she did no caregiving. But the ALJ was not required to believe Harp's assertion, and other evidence amply refuted it. *See Stepp v. Colvin*, 795 F.3d 711, 720 (7th Cir. 2015). For instance, the ALJ permissibly relied on Harp's admission that when she "monitored" Nashawn all night, including changing her diapers, she performed tasks for which the state would otherwise pay non-family members. And the state programs, which paid family members only for caregiving work not normally provided by families, regularly assessed whether they paid Harp according to those restrictions. As for the other caregiver's testimony that she did not observe Harp caring for Nashawn, the ALJ reasonably discounted it because Harp was paid for the hours when the daytime caregiver was not present and could not observe her.

Finally, Harp attempts to characterize her earnings as a "stipend" for giving her daughter a place to live—in other words, the state paid for Nashawn's rent. But the record contains substantial evidence that the state programs paid recipients only for services, not for housing.

AFFIRMED